EDWARD R. GRICE AND CHARLES GRICE v. ORANGE NOBLE, WILLIAM H. COOPER AND WILLIAM CREEVY.

*Sawing contract—Measurement of lumber thereunder—Evidence of same—* *"Manufacture, in a good and workman-like manner," construed—* *Silence, or failure to object, not sufficient to charge third person with* *the debt of another.*

1. A sawing contract provided "that the sawing of lumber, thereunder, was to be paid for in actual board measure; that if lumber was inspected, before shipment, the inspector's scale was to be taken, but if not, it was to be scaled by some competent person, before shipment, or when being loaded on the cars."

Defendants shipped about one-half of the lumber while the sawing was being done, and measured the same as shipped. After the completion of the contract, plaintiffs requested defendants to finish the scale, but they declined to do so until they shipped the balance of the lumber. Plaintiffs thereupon brought suit for the saw bill, and on the trial, one of the plaintiffs was allowed to testify to the measurement, made by him, in the mill, as the boards came from the saw, and he was corroborated by the men who worked on the edger, and who assisted in such measurement and in keeping tally of the same. This testimony was objected to by defendants, as not tending to prove the scale called for by the contract, they claiming that plaintiffs should have called upon them for their scale, or furnished evidence of it, and on their refusal to scale the balance of the lumber, should have procured some "competent person," under the contract, and made such scale before bringing suit.

*Held,* that defendants, having put it out of the power of plaintiffs to scale the lumber sold, could not insist on a scale of the balance;

that there was no evidence that Grice and the edger men were not competent persons, or that their tally was not an ordinarily correct one; that defendants could not be harmed by it, having their scale in their possession, and that they were as much bound to scale the balance of the lumber as the plaintiffs.

*Held,* further, that their action justified a recovery by plaintiffs, under their mill scale if made by competent persons.

2. Where a contract provided for the manufacture of lumber, "in a good and workman-like manner," without reference to any particular kind of mill, it was error to admit testimony "that portable mills were not expected to manufacture as good lumber as stationary ones," and to instruct the jury, that, "if plaintiffs used reasonably good machinery, as compared with the machinery generally used in doing similar jobs at that locality, and in the surrounding lumbering country, this would be sufficient, as far as machinery was concerned."

3. A man cannot be charged with the debt of another, or made responsible for the goods he may afterwards obtain, by his mere silence, or failure to object when notified that such goods will be charged to him.

Error to Huron. (Wixson, J.) Argued January 22, 1886. Decided February 3, 1886.

Assumpsit. Defendants bring error. Reversed.

The facts are stated in the opinion.

*Wheeler & McKnight* and *James H. Hall*, for appellants.

Brief mainly confined to a discussion of the facts. In regard to liability of plaintiffs for goods sold and delivered to Rapson, appellants' counsel cite: *McClenkan v. McMillan*, 6 Penn. St. 366, in support of the proposition that "silence does give consent, and it is for the jury, weighing all the facts and circumstances, to say whether there was such consent as would bind plaintiffs."

*Winsor & Snover* and *W. T. Mitchell*, for plaintiffs:

Defendants, by shipping the lumber before being scaled by a scaler agreed upon, and by refusing to scale balance, have deliberately put it out of the power of either party to have all of the lumber scaled by such a scaler, and plaintiffs' testimony, as to the mill scale, was admissible: *McLennan v. McDermid*, 52 Mich. 468. An unprofessional log-scaler can testify to his scale, and the weight of the evidence is for the

jury : *Busch v. Kilborne*, 40 Mich. 297. Contracts cannot arise from the action of one party alone : 1 Pars. on Contracts, page 475 ; *Barry v. Davis*, 33 Mich. 515 ; *Thornton v. Sturgis*, 38 Mich. 639 ; *Ahearn v. Ayres*, Ib. 692.

MORSE, J. Plaintiffs sued defendants in assumpsit, filing a declaration upon the common counts, under which they presented a bill of particulars as follows :

" To sawing 502,300 feet of lumber at $2.50 per M., under contract between E. R. Grice & Bro. and Noble, Cooper & Creevy, which contract bears date April 5, 1884, $1,255.75,"

The defendants pleaded the general issue, and gave notice that they would prove, under such issue, upon the trial, that the work was done under a certain contract, (setting it out ;) and that, while defendants had fulfilled their contract, the plaintiffs had failed to do so in several particulars, to-wit :

(1.) They did not "slab the logs as light as possible."

(2.) They did not commence sawing for a long time after the date agreed upon in the contract.

(3.) They sawed for other parties, without the consent of defendants.

(4.) They did not manufacture the lumber in a good and workman-like manner, and did not furnish the proper tools and machinery for manufacturing according to the contract.

(5.) They did not saw the lumber as directed by the defendants, thereby violating the contract.

And asking a recoupment for damages occasioned by such alleged non-fulfillment of the contract, in the sum of $1,000. Defendants also gave notice of set-off, and filed a bill of particulars of the same, among which was a claim for a bill of goods furnished one Walter Rapson, who was in the employ of plaintiffs.

Upon the issue thus formed, the case went to the jury, who returned a verdict for the plaintiffs in the sum of $829.75.

Over thirty assignments of error are made in the record, but in disposing of them we shall follow the argument of defendants' counsel, who grouped them under three general heads.

The contract between the parties was as follows :

" This contract, made this fifth day of April, A. D. 1884, by and between E. R. Grice & Bro., of Bridgehampton, Sanilac county, Michigan, of the first part, and Noble, Cooper & Creevy, of Port Austin, Michigan, of the second part, witnesseth :

The said E. R. Grice & Bro., of the first part, agree to saw the logs belonging to the said parties of the second part now landed at the Walter Rapson farm, in the township of Lincoln, on the town line between Verona and Lincoln townships, Huron county, Michigan, and amounting to about six hundred thousand feet of lumber.

The said lumber is to be manufactured in a good and workman-like manner, the said parties of the first part agreeing to use a good edger in the manufacture of said lumber, and to butt off ends and split boards and plank (or lumber) when it is required in order to make it more valuable.   The parties of the first part agree to saw the said lumber into such thicknesses and sizes as the parties of the second part may direct, but not less than one inch in thickness.   The said parties of the first part agree to commence sawing the said logs in about a week from date, and to continue to saw them until sawed up, and not to saw lumber for other parties unless consented to by the parties of the second part.   The sawing of said lumber is not to be paid for in log measure, but in actual board measure ; and if the lumber is to be inspected before being shipped, the inspector's scale is to be taken, but if not inspected before shipped it is to be scaled by some competent person, before being shipped, or when loading on the cars.   The said parties of the first part are to take the logs where they are, and deliver the lumber alongside of a switch to be built on the Port Huron & Northwestern Railroad, piled up with cross-pieces.   Whenever the machinery should get out of order, and bad manufacturing result from it, or whenever bad manufacturing occurs in any way, the party of the second part reserves the right to stop the parties of the first part from manufacturing.   The party of the first part agrees to slab the logs as light as possible.

The party of the second part agree to pay the said party of the first part, for the work above mentioned, the sum of two dollars and fifty cents per thousand feet, as above stated, in the following manner: One dollar and fifty cents per thousand feet on the expiration of the first month's sawing on said logs ; on the expiration of the second month s sawing they are to have fifty cents per thousand feet more on the first

month's sawing, and two dollars per thousand feet on the second month's sawing ; and the balance when the job is completed."

The first three assignments relate to the admission of plaintiffs' testimony as to the amount of lumber sawed. The measurement of the lumber, under the contract, was to be actual board measure, and not log measure. If inspected before shipping, the inspector's scale was to be taken; but if not, it was to be scaled by some competent person before being shipped, or when loaded upon the cars.

It appears from the record that defendants were shipping the lumber while the sawing was going on, and defendants measured the same as they shipped it. It was claimed on the part of the plaintiffs that, after the job was completed, they asked defendants to finish the scale, and they said they could not do it at present, but would in a short time. They put plaintiffs off in this way once or twice, and finally said they would not scale it until they shipped it. The plaintiffs told them they had waited long enough, and would have to sue them. Defendants replied that it would take longer to get the money in that event than plaintiffs thought, but at the time set up no claim that it was the duty of the plaintiffs to have any further scale or measurement made. Defendants had scaled and shipped about one-half the lumber.

The plaintiffs thereupon brought suit, and one of them, Charles Grice, was allowed, against objection, to testify to the measure made by him in the mill as the boards came from the saw, the witness scaling the inside boards, and the edger-man scaling the boards that went to the edger, putting the amount down on a tally-board, which was added to witness' tally, and put down in his book nearly every night in the week; sometimes, however, running two or three nights before a transfer from tally-board to the book would be made.

James Gordon, Charles Berget, and Jesse Tarzwell, the men who worked on the edger, gave testimony as to their tally corroborating Grice. This evidence was objected to because it was not the scale called for by the contract, and a

motion was made to strike out all the testimony on the ground that it was not such evidence as the plaintiffs could recover upon. The testimony was allowed to stand, and the court instructed the jury in relation thereto as follows :

" Under this contract, if the defendants went on and employed a man to do the scaling or measuring of the lumber, and in this way scaled or measured a part of the lumber, and the plaintiffs, after the completion of the job, asked defendants to measure the lumber and pay the amount due, and the defendants refused or neglected to do so, without setting up any claim that it was the duty of the plaintiffs to have any further scale or measurement made, the defendants cannot now defeat the plaintiffs' claim for want of the scale which defendants had themselves undertaken and partly made."

The main argument does not seem to be directed so much against the manner of the measurement as it is against the competency of it under the contract. It is claimed that the plaintiffs should have called upon the defendants for the scale they had made of the lumber shipped, or furnished evidence of it; and that. when defendants refused to scale the balance, the plaintiffs should have procured some " competent person," under the contract, and made a scale before bringing suit.

We think the court was right in admitting the testimony, and in his direction to the jury. It is not contended that the lumber shipped by defendants was scaled by any one agreed upon by the parties, or with any particular reference to the terms of the contract. As the defendants shipped the lumber, one of them, Creevy, scaled some, and other men in their employ measured some. This measurement was in their possession, and not furnished to plaintiffs. The lumber was shipped away, so that plaintiffs could make no further measurement of that portion of the sawing, and must rely upon the mill tally. Defendants, having put it out of the power of plaintiffs to scale the lumber sold, could not well insist upon a scale of the balance. Nor is there any evidence to show that Grice and the edger-men were not competent persons, or that the tally was not an ordina-

rily accurate one. Nor could the defendants be harmed by it. They had in their possession the scale they had made of the lumber shipped, and they were as much bound to scale the balance as plaintiffs, and there was nothing to prevent their doing so if they were not satisfied with the plaintiffs' tally.

The saw bill was long past due when suit was brought, and upon the trial no evidence was offered by defendants to show that a less amount was sawed than claimed by plaintiffs. They were asked to finish the scale they had commenced, which they neglected to do, with the evident intent of delaying payment, and the court held the true view when he instructed the jury, that "defendants could not defeat plaintiffs' claim for want of a scale which defendants had themselves undertaken and partly made." Their disposing of the lumber scaled by them, and refusing to scale the balance, justified the plaintiffs in recovering under their mill-scale, if it was done by competent persons. Evidently, under the contract, none of the lumber was to be thrown out because it did not come under any certain grade or grades. The logs belonged to defendants, and were many of them old, worm-eaten and rotten. All the lumber manufactured from them was to be taken by defendants, and the plaintiffs paid for the sawing of the same. By the contract, as interpreted by its terms, and the joint action of the parties under it afterwards, the scaling contemplated was not for the purpose of any inspection into grades, but to get at the whole number of feet sawed.

No controversy arose between the parties as to the acceptance of the whole amount manufactured, the defendants relying upon their claim of damages for the defective work. No showing was made upon the trial that the mill-scale was incorrect, nor that it was done by incompetent persons.

Another set of assignments of error relates to the manner of doing the work. The court charged the jury that "if plaintiffs used reasonably good machinery, as compared with the machinery generally used in doing similar jobs at that

locality, and in the surrounding lumbering community, this would be sufficient as far as the machinery was concerned."

A witness was also allowed to testify, on cross-examination, against the objection of defendants' counsel, that portable mills were not expected to manufacture as good lumber as stationary ones.

This we think was error. The contract said nothing about portable mills or other mills in the locality or lumbering community where this manufacturing was done. The lumber was " to be manufactured in a good and workman-like manner," without any reference to mills of any kind. The mill of plaintiffs was not on the ground when the contract was made, and there is no evidence that the contract was made with reference to it. The claim of the plaintiffs on the trial was that their mill was a new one, the machinery perfect, and that it did good, first-class work. The defendants did not dispute plaintiffs' claim as to the character of the mill, or its machinery ; but insisted that the sawing was poorly done, and not up to the contract.

The admission of this evidence, and the charge of the court, was outside of the issue. The question to be decided by the jury was whether the work was done in a good and workman-like manner. The testimony and the instruction gave them an opportunity, not permissible, to find that the sawing, although not well done, was yet as good as portable mills generally in that part of the country turned out, and therefore sufficient under the court's interpretation of the contract.

In relation to the bill of goods set forth in defendants' bill of particulars of their set-off, sold and delivered by them to Rapson, defendants claim error in the court's striking out the testimony of the defendant Creevy, " that he should not have given the goods to Rapson if he had not been working for Grice; that " Grice consented the goods should be charged to plaintiff;" that " Grice didn't object to it;" and in refusing to let the same witness answer the following questions : " *Question*. Had you refused to trust Rapson, before this time, any further ? *Q*. Before that time, had

you refused to trust Rapson at all? *Q.* Would you have advanced a dollar to Rapson on his own credit? *Q.* What was the amount of goods or credit furnished to Rapson?" And also in instructing the jury, in substance, that the mere silence of plaintiffs could not bind them for the goods furnished to Rapson.

Creevy was brought upon the stand several times to make a case, whereby the goods sold by defendants to Rapson could be made a charge against the plaintiffs; and the most that could be made of his testimony was this: Rapson was working for plaintiffs. Defendants had been trusting him on his own account. Creevy saw Grice, and said to him that what Rapson got of defendants would be charged to plaintiffs, and turned on the saw bill. Grice made no reply whatever. Cooper, another of the defendants, also testified that he spoke to Grice about turning the account, and Grice said he could not do it then. This talk with Cooper was after the goods had all been furnished to Rapson.

There was no error in the rulings or in the instructions. A man cannot be charged with the debt of another, or be made responsible for the goods another may afterwards obtain, by his mere silence, or by his failure to object, when notified that such goods will be charged to him. A man's silence, when a statement is made to him, may sometimes go to the jury as evidence against him; as when, some time after the making of a verbal contract between two parties, one stated to the other the terms of the contract, and he did not dissent. It is received in evidence upon the presumption that his silence admits the statements to be true. But a contract cannot be made by one party making a proposition to another, without some word or act of the other accepting it; and mere silence in such a case is not an act. If one should propose to sell a horse to another for $100, and no reply was made, and no act done towards accepting the horse, it would hardly be claimed that a sale was made. Much less can the silence of one obligate him for the debt of another.

We find no further error in the record.

Because of the error heretofore noted, the judgment is reversed, and new trial granted, with costs of the court to defendants.

The other Justices concurred.